United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 13, 1998 Decided February 2, 1999 

 No. 97-7190

 Billie Davenport, et al., 

 Appellants

 v.

 International Brotherhood of Teamsters, AFL-CIO, et al., 

 Appellees

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 97cv01954)

 Barbara Harvey argued the cause for appellants. With 
her on the briefs was Arthur L. Fox, II.

 Daniel B. Edelman argued the cause for appellee Interna-
tional Brotherhood of Teamsters, AFL-CIO. With him on 
the brief was Earl V. Brown, Jr.


 Neal D. Mollen argued the cause for appellee Northwest 
Airlines, Inc. With him on the brief was John J. Gallagher.

 Edgar N. James and Marta Wagner were on the brief for 
appellee Teamsters Local 2000.

 Before: Henderson, Rogers and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Garland.

 Garland, Circuit Judge: The plaintiffs in this case are 
individual members of the International Brotherhood of 
Teamsters, AFL-CIO ("IBT"), and of IBT Local 2000 ("Local 
2000") which represents all flight attendants employed by 
Northwest Airlines ("Northwest"). The dispute concerns a 
temporary labor agreement known as the "Bridge Agree-
ment." Plaintiffs sued the IBT, Local 2000 and Northwest, 
contending that the president of Local 2000 lacked authority 
to enter into the Bridge Agreement because he failed to 
submit it for ratification by the union's membership. The 
district court denied plaintiffs' request for a preliminary 
injunction against implementation of the Agreement. We 
affirm.

 I

 The employment relationship between Northwest and its 
flight attendants is governed by a collective bargaining agree-
ment entered into on August 1, 1993.1 Section 5.A of the 
agreement regulates the number of hours a flight attendant 
can be required to fly within a given period of time ("flight 
time"), the number of hours a flight attendant can be re-
quired to work in a shift ("duty time"), and rest periods. See 
Appendix ("App.") 78-80. Specifically, s 5.A.3.b prescribes 
what is known as the "8-in-24" rule, which states that a flight 
attendant cannot be scheduled for more than 8 hours of flight 
time within any 24-hour period unless certain interim rest 
conditions are met. Section 5.A.3.d states that attendants 

__________
 1 By its terms, the 1993 agreement became amendable 60 days 
prior to August 2, 1996, and the parties currently are engaged in 
negotiations for a new collective bargaining agreement. Complaint 
p 18.

generally cannot be scheduled for more than 30 hours of 
flight time in any 7-day period. Section 5.A.4 provides the 
additional restriction that duty time may last no more than 12 
to 14 hours.

 In March 1993, while the collective bargaining agreement 
was under negotiation, the Federal Aviation Administration 
announced that for the first time it was considering including 
flight attendant duty time in its Federal Aviation Regulations 
("FARs"). See 58 Fed. Reg. 17,024 (1993). Northwest and 
the IBT responded by including the following language in the 
final version of section 5.A.3:

 Current Federal Air Regulations as described in para-
 graphs 3.a. through e. below, shall apply to all Flight 
 Attendants for daily and weekly limitations. Any 
 changes or modifications in the Federal Air Regulations 
 shall also be applied to Flight Attendants.

App. 78. The new FARs were published on August 19, 1994 
and became effective in early 1996. They regulate duty time 
and rest periods for flight attendants by permitting airlines to 
assign duty time of 14 to 20 hours, rather than the 12 to 14 
hours prescribed by the collective bargaining agreement. 
The FARs do not limit flight time, whereas the collective 
bargaining agreement limits it to 8 hours in 24 and 30 hours 
in 7 days. See 59 Fed. Reg. 42,974 (1994); 14 C.F.R. 
s 121.467.

 Northwest took the position that in light of the new FARs, 
section 5.A.3 of the collective bargaining agreement permitted 
it to implement changes in the flight time limits, as well as to 
override other limits previously set forth in section 5.A. At a 
meeting on October 31, 1994, the then-president of Local 
2000, Mary Don Erskine, disagreed. Erskine's successor as 
president of Local 2000, Bruce Retrum, took office two 
months later, on January 1, 1995. Northwest continued to 
press its position and negotiations ensued.

 In June 1996, Northwest sent Retrum a proposed letter of 
agreement and stated that if the dispute were not resolved 
shortly, Northwest would seek arbitration. App. 194. 

Northwest's proposal was known as the "Bridge Agreement," 
so-called because it was intended to remain effective only for 
a "bridge" period until a permanent agreement was reached 
under a new collective bargaining agreement. See supra note 
1. Under the Bridge Agreement, Northwest would be al-
lowed to override the 8-in-24 rule when scheduling "higher 
value turnarounds" ("HVTs"), flight sequences that begin and 
end at a flight attendant's home base and generally do not 
involve more than three separate flight segments. In return, 
Northwest would pay flight attendants higher, international 
flight rates in certain instances involving longer flight and 
duty time, and would refrain from implementing other modifi-
cations in flight and duty time it believed authorized by the 
new FARs.

 On July 17, 1996, Retrum responded that he would prefer 
to continue negotiations rather than begin arbitration. 
Northwest agreed to postpone arbitration, and negotiations 
continued for the next several months without resolution. An 
arbitration date was set for January 29, 1997.

 In late January 1997, just before the arbitration was sched-
uled to begin, Retrum held two conference calls to discuss the 
situation with base representatives and executive board mem-
bers of Local 2000. Retrum said that he had reviewed the 
Bridge Agreement with the lawyers for Local 2000, who had 
advised him that the Local "could not hope to win an arbitra-
tion" on the matter. Id. at 39. Retrum took a vote of the 
base representatives and executive board to determine wheth-
er to arbitrate the issue, accept the Bridge Agreement, or do 
nothing. The majority voted to accept the proposal. Id. at 
40.

 Some Local 2000 representatives, however, objected to 
adopting the Agreement without ratification by the member-
ship. During one of the conference calls, Retrum explained 
that since the Agreement "was a grievance settlement and 
not an amendment to the contract," ratification was unneces-
sary. Id. at 476. Thereafter, Retrum consulted with the IBT 
Legal Department regarding membership ratification, and 
was specifically advised that ratification was unnecessary. 


Id. at 477. Retrum signed the Bridge Agreement on Febru-
ary 11, 1997.

 On March 11, 1997, five union members, two of whom are 
plaintiffs in this case, wrote to the then-General President of 
the IBT, Ron Carey, expressing their view that Retrum had 
no authority to enter into the Bridge Agreement without 
membership ratification. They asked Carey to review the 
matter and determine whether ratification was required. Id. 
at 363-64. On March 21, 1997, Carey wrote to Retrum. 
Carey stated that he had "completed [his] review of the flight 
duty time issue and the terms of the settlement signed by 
Local 2000." He recommended that the Local "immediately 
communicate the terms of the settlement to the membership," 
"encourage membership input regarding aspects of the settle-
ment which they believe adversely impacts them," and then 
"use this member information to determine its bargaining 
proposal or position" in ongoing negotiations with Northwest 
for a new collective bargaining agreement. He did not, 
however, suggest that ratification was required. Id. at 62-63.

 On August 8, 1997, the IBT wrote to Northwest. "Without 
taking a position as to whether the bridge agreement is 
subject to [the ratification] requirement," the IBT wrote, 
"there is a colorable issue as to the agreement's validity 
absent ratification." Id. at 10. The IBT advised Northwest 
that it would submit the matter to the membership for an 
advisory vote, and specifically reserved the right to arbitrate 
the issue. Id. at 10-11. Northwest responded on August 12, 
1997 that, pursuant to the Bridge Agreement, it would imple-
ment HVTs in September and October 1997. Id. at 189.

 On August 26, 1997, the plaintiffs sued to prevent imple-
mentation of the Agreement and moved for a temporary 
restraining order and preliminary injunction. The complaint, 
which named the IBT, Local 2000, and Northwest as defen-
dants, alleged three causes of action. Plaintiffs contended 
that by going ahead with the Bridge Agreement without 
membership ratification, Local 2000 and the IBT had: (1) 
violated plaintiffs' equal voting rights under section 101(a)(1) 
of the Labor-Management Reporting and Disclosure Act 


("LMRDA"), 29 U.S.C. s 411(a)(1);2 (2) breached plaintiffs' 
ratification rights under the IBT constitution in violation of 
section 301 of the Labor Management Relations Act 
("LMRA"), 29 U.S.C. s 185;3 and (3) breached their duty of 
fair representation. App. 1-9. The complaint did not assert 
a cause of action against Northwest, although it did allege 
that Northwest "knew and understood that a supplemental 
agreement or agreement to modify or amend a collective 
bargaining agreement was required to be ratified by the 
affected membership before it may be implemented," and that 
Northwest could not "lawfully implement the Bridge Agree-
ment with knowledge that it was not ratified in accordance 
with the IBT constitution." Id. at 5, 7.

 On October 3, 1997, the district court denied the motion for 
a preliminary injunction, holding that plaintiffs could not 
establish a likelihood of success on the merits. Treating the 
counts leveled against the union defendants as if they also 
had been leveled against Northwest, the court held that the 
two statutory causes of action could not lie against North-
west. See Davenport v. International Bhd. of Teamsters, 981 
F. Supp. 6, 8-9 (D.D.C. 1997). LMRDA s 101, the court 
held, governs only the rights of union members against 
unions. LMRA s 301, it said, does not apply to employers 
__________
 2 LMRDA s 101(a)(1) provides:

 Every member of a labor organization shall have equal rights 
 and privileges within such organization to nominate candi-
 dates, to vote in elections or referendums of the labor 
 organization, to attend membership meetings, and to partici-
 pate in the deliberations and voting upon the business of 
 such meetings, subject to reasonable rules and regulations in 
 such organization's constitution and bylaws.

 3 LMRA s 301(a) provides:

 Suits for violation of contracts between an employer and a 
 labor organization representing employees in an industry 
 affecting commerce as defined in this chapter, or between 
 any such labor organizations, may be brought in any district 
 court of the United States having jurisdiction of the parties, 
 without respect to the amount in controversy or without 
 regard to the citizenship of the parties.

like Northwest, who are subject to the Railway Labor Act 
("RLA"), 45 U.S.C. ss 151-188. The district court further 
held that because Northwest had not bargained in bad faith, 
and had not knowingly implemented an unratified agreement 
that was an obvious alteration of the terms of the collective 
bargaining agreement, the duty of fair representation could 
not give rise to a valid cause of action against Northwest. 
Davenport, 981 F. Supp. at 8-9 & n.2.

 Subsequently, the members of Local 2000 elected plaintiffs 
Billie Davenport and Danny Campbell as the two principal 
officers of Local 2000, with Davenport replacing Retrum as 
president. On December 18, 1997, the Local held a referen-
dum on the Bridge Agreement and the members rejected it 
decisively. Thereafter, the IBT demanded that Northwest 
rescind the Agreement. When Northwest refused, the IBT 
filed a cross-claim against Northwest pursuant to the RLA, 
seeking an injunction requiring Northwest to cease applying 
the Bridge Agreement and to restore and maintain the status 
quo.

 II

 Plaintiffs appeal the district court's denial of their motion 
for a preliminary injunction. Although the IBT and Local 
2000 remain nominal defendants-appellees, they now support 
the position of the plaintiffs.

 A court considering a plaintiff's request for a preliminary 
injunction must examine whether: (1) there is a substantial 
likelihood plaintiff will succeed on the merits; (2) plaintiff will 
be irreparably injured if an injunction is not granted; (3) an 
injunction will substantially injure the other party; and (4) 
the public interest will be furthered by an injunction. See 
Serono Lab. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 
1998). These factors interrelate on a sliding scale and must 
be balanced against each other. Id. at 1318. We review the 
district court's weighing of the preliminary injunction factors 
for abuse of discretion, while reviewing its underlying legal 
conclusions de novo and its underlying factual findings for 
clear error. Id.

 III

 The district court held that the plaintiffs were not likely to 
succeed on the merits because they could not establish a 
cause of action against Northwest. Plaintiffs do not appeal 
the court's rejection of their claim under LMRDA s 101, see 
Pl. Br. at 14 n.6, but do dispute the court's conclusions with 
respect to the duty of fair representation and LMRA s 301. 
They also raise a number of additional, miscellaneous argu-
ments.

 A

 The Railway Labor Act, 45 U.S.C. ss 151-188, governs 
labor relations in the railroad and airline industries. Section 
2 of the RLA grants to employees the right to organize and 
bargain collectively through representatives of their own 
choosing, and requires employers under the Act to bargain 
exclusively with the representatives so chosen. 45 U.S.C. 
s 152. Based on that section and other considerations, the 
Supreme Court has inferred a duty of fair representation 
owed by unions to their members. See Air Line Pilots Ass'n, 
Int'l v. O'Neill, 499 U.S. 65, 74-76 (1991); Steele v. Louisville 
& Nashville R.R. Co., 323 U.S. 192, 199-203 (1944).4

 A union "breaches its duty of fair representation if its 
actions are either 'arbitrary, discriminatory, or in bad faith.' " 
Air Line Pilots, 499 U.S. at 67 (quoting Vaca v. Sipes, 386 
U.S. 171, 190 (1967)). A union's actions are arbitrary, the 
Supreme Court has held, "only if, in light of the factual and 

__________
 4 The duty of fair representation also applies to unions certified 
under the National Labor Relations Act ("NLRA"), based on 
NLRA provisions comparable to section 2 of the RLA. See Vaca v. 
Sipes, 386 U.S. 171, 177 (1967); Ford Motor Co. v. Huffman, 345 
U.S. 330, 336-37 (1953). Cases describing the scope of the duty 
freely cite precedents under both statutes. See, e.g., Marquez v. 
Screen Actors Guild, 119 S. Ct. 292, 300 (1998) (citing Air Line 
Pilots, 499 U.S. at 67); Air Line Pilots, 499 U.S. at 67 (citing Vaca, 
386 U.S. at 190); Ford Motor Co., 345 U.S. at 337 (citing Steele, 323 
U.S. at 198-99).

legal landscape at the time of the union's actions, the union's 
behavior is so far outside a wide range of reasonableness as 
to be irrational." Id. at 67 (internal quotation and citation 
omitted); see Marquez v. Screen Actors Guild, 119 S. Ct. 292, 
300 (1998). "The duty of fair representation does not itself 
require ratification votes," although "the discriminatory deni-
al of the right to ratify [an agreement with the employer] 
may be inconsistent with a union's obligation." American 
Postal Workers Union, Local 6885 v. American Postal Work-
ers Union ("Postal Workers"), 665 F.2d 1096, 1105 n.20 (D.C. 
Cir. 1981).

 Under certain circumstances, where a union has breached 
its duty of fair representation an employer may also be 
implicated in the union's breach. See Czosek v. O'Mara, 397 
U.S. 25, 29 (1970); Postal Workers, 665 F.2d at 1109-10; 
Steffens v. Brotherhood of Ry., Airline & S.S. Clerks, 797 
F.2d 442, 445 & n.2 (7th Cir. 1986). In Postal Workers, we 
recognized that "an employer may sometimes be joined in a 
suit involving duty of fair representation claims against a 
union." 665 F.2d at 1109. We noted that "[i]n all such cases, 
however, the employer somehow acted improperly and in-
fringed the rights of the individual aggrieved employees." 
Id. We further observed that in such cases, "the court[s] 
required that the employer have actual notice of, or might 
reasonably be charged with notice of, the union's breach of 
duty to its members." Id.

 The parties dispute the proper standard for determining 
whether an employer can be implicated in a union's breach of 
duty. Northwest focuses on the language in Postal Workers 
which requires that "the employer somehow acted improper-
ly." Id. Citing cases from several circuits, Northwest con-
tends that a plaintiff must "prove employer misconduct which 
amounts to collusion in the union's breach," Northwest Br. at 
20, and not simply "knowledge" of the breach. See, e.g., 
Dement v. Richmond, Fredericksburg & Potomac R.R., 845 
F.2d 451, 464 n.21 (4th Cir. 1988); United Indep. Flight 
Officers v. United Airlines, 756 F.2d 1274, 1283 (7th Cir. 


1985); Raus v. Brotherhood Ry. Carmen, 663 F.2d 791, 797-
98 (8th Cir. 1981).

 Plaintiffs, by contrast, fasten on the "actual notice" lan-
guage of Postal Workers, and argue that an employer's 
"knowledge" of a union's breach is a sufficient predicate. 
They contend that the union breached its duty of fair repre-
sentation when it signed the Bridge Agreement without ratifi-
cation by the membership, knowing that ratification was 
required. And they further assert that Northwest implicated 
itself in the union's breach by signing the Agreement with 
knowledge both that ratification was required and that the 
union had knowingly dispensed with it. In support, they cite, 
inter alia, Goclowski v. Penn Central Transportation Co., in 
which the Third Circuit indicated that a cause of action could 
be made out against both a union and an employer if plaintiffs 
"establish that the Union had no authority to enter into [an] 
agreement and that the employer was aware of this contrac-
tual disability." 571 F.2d 747, 760 (3d Cir. 1978). But see id. 
at 761 n.18 ("On the facts of the instant case, the Railroad's 
collusion with the Union, if proved, would amount to an 
undermining of the basic collective bargaining agreements.") 
(emphasis added). See also Merk v. Jewel Food Stores, 945 
F.2d 889, 896 (7th Cir. 1991) (stating that "[f]ailure to ratify 
under circumstances where an employer is aware both of the 
ratification requirement and of the failure to comply with it 
may invalidate an employer's claims under the unratified 
agreement," but noting that "crucial to our analysis" is that 
"non-ratification was coupled here with a deliberate policy of 
secrecy").

 We need not resolve this legal dispute in order to decide 
this case, because the plaintiffs cannot show a likelihood of 
success on the merits even under the standard they propose.5 
Plaintiffs do not contend that an employer's (or union's) mere 
mistake about whether ratification was required is enough to 

__________
 5 For the same reason, we need not decide whether the union 
itself breached its duty, a necessary prerequisite for concluding that 
the employer was implicated in such a breach. See Postal Workers, 
665 F.2d at 1108.

create liability. See Postal Workers, 665 F.2d at 1101 (noting 
that interpretations of union constitutions by unions, "if rea-
sonable and in good faith, are not to be disturbed by the 
courts"). They concede that the requirement of ratification 
must at least be "objectively clear" at the time. See Oral 
Arg. Tr. at 60-62. Indeed, plaintiffs do not disagree with the 
district court's characterization of their own leading case, 
Goclowski, as one in which " 'the employer ... knowingly 
implemented an unratified agreement that was an obvious 
alteration of the terms of the collective bargaining agree-
ment.' " Pl. Br. at 37 (quoting Davenport, 981 F.Supp. at 9 
n.2 ). They simply disagree with the court's determination 
that this case does not share those facts. But we review such 
a factual finding only to determine whether it is clearly 
erroneous, and we cannot so characterize the district court's 
finding here.

 Plaintiffs accurately note that the IBT constitution provides 
that "amendments" to collective bargaining agreements must 
be ratified by the membership. Article XII, section 2(b). 
And plaintiffs' contention that the Bridge Agreement consti-
tuted such an amendment is not an unreasonable one. But 
the contrary view, that the Bridge Agreement did not alter 
the terms of the collective bargaining agreement but merely 
settled a dispute over their interpretation, is also not unrea-
sonable, let alone irrational. See Air Line Pilots, 499 U.S. at 
67 (holding that a union breaches its duty of fair representa-
tion only where its behavior is "so far outside a wide range of 
reasonableness as to be irrational") (internal quotation and 
citation omitted).

 The collective bargaining agreement provided that "[a]ny 
changes or modifications in the Federal Air Regulations shall 
also be applied to Flight Attendants." Section 5.A.3. Based 
on this provision, Northwest contended that the new FARs 
superseded the duty time and rest period limitations found 
elsewhere in the collective bargaining agreement. Retrum, 
the Local's president, was advised by the Local's legal counsel 
that the union "could not hope to win an arbitration" if it 


disputed Northwest on this issue. App. 39. He was also 
advised by IBT counsel that:

 Letters of understanding that either interpret and/or 
 assist in the application of existing contract language or 
 provide language which memorializes the parties' under-
 standing of a subject by filling in gaps in the contract 
 generally do not require ratification. These types of 
 letters do not change the terms of the contract but 
 merely interpret and apply the contract that was ratified 
 by the membership.

Id. at 26. And the week before Retrum signed the Bridge 
Agreement, he was "specifically advised" by IBT counsel that 
ratification of the Agreement was unnecessary. Id. at 479. 
Based on this advice, Retrum concluded that the union consti-
tution "did not have to be ratified because [it] did not create 
new contract terms but only resolved a dispute over interpre-
tation of the existing contract." Id. at 312; see id. at 477-78.6

 While the IBT now contends that ratification was required, 
that is a position it arrived at quite late.7 Even after the 
signing of the Agreement, the IBT's Legal Department twice 
reaffirmed that "no ratification vote was necessary in the 
opinion of the IBT because the Bridge Agreement was a 
grievance settlement and not an amendment to the collective 
bargaining agreement." Id. at 479; see id. at 481. When the 
plaintiffs put the question directly to the IBT's then-General 
__________
 6 Although the Bridge Agreement used the words "amend" and 
"modify" in its text, Retrum explained that the Agreement used 
"this terminology not because it is an amendment or supplemental 
agreement, but because the underlying language" of the existing 
collective bargaining agreement itself used it. App. 477. As Ret-
rum pointed out, s 5.A.3.b provided that "[a]ny changes or modifi-
cations" in the FARs "shall also be applied to Flight Attendants." 
See id.; see also id. at 78. Retrum also pointed out that side-letters 
typically used by the union and Northwest to resolve disputes over 
interpretation of the collective bargaining agreement (discussed in 
the text below) were sometimes labeled "contract amendments." 
Id. at 306-07.

 7 The IBT took this position in its answer to the plaintiffs' 
amended complaint, filed on September 24, 1997. App. 513, p 14.

President, Ron Carey, he did not suggest that ratification was 
required. Instead, he merely noted in a letter that

 [w]hen the [new] FARs became effective Northwest ad-
 vised Local 2000 that it believed the terms of the collec-
 tive bargaining agreement permitted it to implement 
 changes to the daily and weekly limitations.... The 
 Company argued that it could apply the new FARs to 
 Teamster members and ignore the better contract lan-
 guage because of language ... which provides that "any 
 changes or modifications in the Federal Air Regulations 
 shall also be applied to flight attendants."

Id. at 62. Even after individual union members threatened to 
sue over the failure to ratify, the IBT's Associate General 
Counsel told Northwest only that "there is a colorable issue 
as to the agreement's validity absent ratification"--while 
expressly declining to "conced[e] the correctness of the com-
plaining members' legal position." Id. at 10. Indeed, in their 
amended complaint, plaintiffs charged that "[t]he IBT has not 
repudiated the Bridge Agreement and by its actions it has 
ratified the Agreement." Id. at 464-65, p 14.8

 Of course, none of this establishes as a matter of law that 
Northwest's bargaining position was correct or that ratifica-
tion was unnecessary to settle the dispute. But it does 
support the district court's conclusion that, unlike Goclowski, 
this was not a case where "the employer ... knowingly 
implemented an unratified agreement that was an obvious 
alteration of the terms of the collective bargaining agree-
ment." Davenport, 981 F. Supp. at 9 n.2; cf. Goclowski, 571 

__________
 8 Even on appeal, the IBT concedes that "[t]he IBT constitution 
does not require that settlements of grievances arising under a 
CBA [collective bargaining agreement] be submitted for member-
ship ratification." IBT Br. at 7 (emphasis omitted). It also con-
cedes that the Bridge Agreement "grew out of ... a dispute 
between [Northwest] and Local 2000 over the proper interpretation 
of the underlying" collective bargaining agreement. Id. It con-
tends, however, that the Agreement "did not resolve" that dispute 
and instead "effected a series of amendments to the underlying 
CBA." Id.

F.2d at 760 ("Plaintiffs have set forth far more than a mere 
disagreement with Union officials over the meaning of the 
Union's constitution."). The fact that the IBT itself described 
plaintiffs' position as no more than "colorable" seriously un-
dermines its current contention that the employer should 
have assessed that position as "obviously" correct. Indeed, 
given the conclusion of the Local's president that ratification 
was unnecessary, it would have been problematic for North-
west to have refused to implement the agreement without 
ratification. See Moreau v. James River-Otis, Inc., 767 F.2d 
6, 10 (1st Cir. 1985) ("Management should neither be allowed 
nor required to scrutinize internal union policies and practices 
too closely, and, indeed, it may commit an unfair labor 
practice if it delves too deeply into the union's affairs."); 
Central States Southeast & Southwest Areas Pension Fund 
v. Kraftco, Inc., 799 F.2d 1098, 1113 & n.19 (6th Cir. 1986); cf. 
Teamsters Local Union No. 251 and McLaughlin & Moran, 
Inc., 299 N.L.R.B. 30, 32 (1990) ("[A]n employer may not 
lawfully refuse to sign a contract on the basis that the union's 
ratification procedures were not in accordance with the re-
quirements of its constitution and bylaws.").

 The conclusion that a ratification requirement was not 
"obvious" is further supported by a history in which North-
west and Local 2000 had settled numerous contract interpre-
tation disputes via side-letter agreements signed by the Local 
2000 president without ratification by the membership. As 
Retrum explained, these letters "typically resolve[d] some 
dispute between Local 2000 or its predecessors and North-
west Airlines concerning the proper interpretation or applica-
tion of the Collective Bargaining Agreement," and had never 
been challenged as not binding because they had not been 
ratified. App. 306-07. While these letter agreements were 
not as far-reaching as the Bridge Agreement, many did 
interpret substantive collective bargaining agreement provi-
sions. This established practice of settling disputes without 
ratification undermines plaintiffs' contention that Northwest 
should have known Retrum lacked authority to enter into a 
binding agreement without ratification. See Central States, 
799 F.2d at 1114 ("[T]he union's entry into and compliance 


with [two] prior letter agreements constituted representations 
by the union to the employer that union officials were autho-
rized to enter into side letter agreements ... without ratifica-
tion."); cf. NLRB v. International Union of Elevator Con-
structors, Local No. 8, 465 F.2d 974, 975 n.1 (9th Cir. 1972) 
("When a union representative indicates that he has authority 
to enter into a binding agreement without membership ratifi-
cation, and there is an established history of entering into 
bargaining agreements without such ratification, the [u]nion 
cannot later contend that ratification is necessary.").

 Finally, plaintiffs argue that Northwest knew or should 
have known that ratification of the Bridge Agreement was 
required because the union had insisted on a ratification vote 
when Northwest made an earlier attempt to implement high-
er value turnarounds in 1992. The circumstances in 1992, 
however, were considerably different. Like the 1993 collec-
tive bargaining agreement, the agreement in effect in 1992 
set flight and duty time restrictions. But unlike the 1993 
agreement, the earlier collective bargaining agreement did 
not provide that "[a]ny changes or modifications in the FARs 
shall be applied to Flight Attendants." Accordingly, in 1992 
it was clear that Northwest could implement HVTs only by 
amending the collective bargaining agreement. Under the 
1993 agreement, by contrast, Northwest could reasonably 
argue that under the new FARs it had authority to imple-
ment HVTs without amending the agreement.

 In sum, even assuming that an employer can be implicated 
in a union's breach of the duty of fair representation merely 
by implementing an agreement with knowledge of that 
breach, we cannot find clearly erroneous the district court's 
conclusion that Northwest had no such knowledge. Accord-
ingly, we agree with the district court that plaintiffs are not 
likely to succeed on the merits of this claim against the 
airline.

 B

 Plaintiffs also appeal the district court's rejection of their 
claim under LMRA s 301, 29 U.S.C. s 185(a). See supra 

note 3. That section provides both jurisdiction and a cause of 
action for suits alleging a violation of a contract between an 
employer and a labor organization, or between labor organiza-
tions. See Textile Workers Union v. Lincoln Mills, 353 U.S. 
448, 456 (1957); see also Local 14 Nursing Home Pension 
Fund v. Demisay, 508 U.S. 581, 590 (1993); Franchise Tax 
Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 23 
(1983). Plaintiffs contend that s 301 subjects Northwest to 
"accountability for knowingly benefitting from [the] union's 
violation of members' ratification rights." Pl. Br. at 41.

 As the district court pointed out, however, LMRA s 301 
does not apply to this case. The LMRA applies only to 
"contracts between an employer and a labor organization 
representing employees in an industry affecting commerce as 
defined in this chapter, or between any such labor organiza-
tions." 29 U.S.C. s 185 (emphasis added). "Employer" is 
defined in the chapter to exclude "any person subject to the 
Railway Labor Act," id. s 152(2), and "employee" is defined 
to exclude "any individual employed by an employer subject 
to the Railway Labor Act," id. s 152(3).9 As a "common 
carrier by air," Northwest is subject to the RLA. 45 U.S.C. 
s 181. Accordingly, as the district court held, a cause of 
action does not lie against Northwest under section 301. See 
Brotherhood of Teamsters Local No. 70 v. Western Pac. R.R., 
809 F.2d 607, 609 (9th Cir. 1987); Steffens, 797 F.2d at 445 
n.2; United Indep. Flight Officers, Inc., 756 F.2d at 1283; 
Fechtelkotter v. Air Line Pilots Ass'n, Int'l, 693 F.2d 899, 
902-03 (9th Cir. 1982); Raus, 663 F.2d at 794; Brotherhood 
of Locomotive Firemen v. United Transp. Union, 471 F.2d 8, 
9 (6th Cir. 1972).10

__________
 9 29 U.S.C. s 152 itself provides definitions only for use in 
subchapter II of Chapter 7, Title 29 of the United States Code. 
LMRA s 301, 29 U.S.C. s 185, is in subchapter IV. 29 U.S.C. 
s 142(3), however, provides that "employer," "employee" and "labor 
organization" "shall have the same meaning" when used throughout 
Chapter 7 "as when used in subchapter II."

 10 Nor are we persuaded by plaintiffs' contention that Wooddell 
v. International Brotherhood of Electrical Workers, Local 71, 502 


 C

 Neither plaintiffs' original complaint, nor their amended 
complaint, expressly stated any cause of action against North-
west. Nonetheless, the district court liberally construed the 
complaint to assert the same causes of action against North-
west as it asserted against the Local and the IBT. We have 
accepted that characterization for purposes of this appeal, and 
have reached the same conclusions as the district court 
regarding the validity of those claims.

 Plaintiffs' appellate briefs offer three additional lines of 
argument. But not only do those arguments fail to state a 
cause of action against Northwest, they fail to articulate a 
cause of action against any party.

 First, plaintiffs point to 28 U.S.C. s 1337 as a statute that 
subjects Northwest to accountability for benefitting from the 
union's asserted violation of its members' ratification rights. 
Pl. Br. at 41. Section 1337, however, merely grants district 
courts "jurisdiction of any civil action or proceeding arising 
under any Act of Congress regulating commerce or protect-
ing trade and commerce against restraints and monopolies." 
28 U.S.C. s 1337(a) (emphasis added). Plaintiffs have identi-
fied no Act of Congress--other than those discussed above--
under which such a cause of action might arise.

__________
U.S. 93 (1991), overrules this line of authority. Wooddell did not 
address the application of section 301 to actions involving employers 
and employees subject to the RLA. Rather, Wooddell merely held, 
in a case in which all of the parties were subject to the LMRA, that 
a union constitution is a "contract between labor organizations" and 
hence covered by section 301. See id. at 98-100. Here, although 
plaintiffs' claim does involve such a contract, one of the parties--
Local 2000--is not a "labor organization" within the meaning of 
section 301 because its members are employed by an employer 
subject to the RLA. See 29 U.S.C. ss 152(2), (3), (5); Brotherhood 
of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 376-
77 (1969); Fechtelkotter, 693 F.2d at 902-03; Brotherhood of Loco-
motive Firemen, 471 F.2d at 9; Bell v. Chesapeake & Ohio Ry., 58 
F.R.D. 566, 568-69 (S.D. W.Va. 1973).

 Second, plaintiffs contend that Northwest may be joined in 
their action against the Local and the IBT under Rule 19 of 
the Federal Rules of Civil Procedure, which provides for the 
"joinder of persons needed for just adjudication." Northwest 
is a necessary party, plaintiffs contend, because its presence 
is necessary for the court to set aside the Bridge Agreement. 
But while Rule 19 provides for joinder of necessary parties, it 
does not create a cause of action against them. See Vieux 
Carre Property Owners, Residents & Assocs., Inc. v. Brown, 
875 F.2d 453, 457 (5th Cir. 1989) ("[I]t is implicit in Rule 19(a) 
itself that before a party will be joined ... as a defendant the 
plaintiff must have a cause of action against it."); cf. 4 James 
W. Moore, Moore's Federal Practice s 19.04[1][a] (3d ed. 
1998) ("[Rule 19] governs only the procedural propriety of 
joinder and, as a rule of procedure, cannot affect the jurisdic-
tion or venue of the federal court."). It is not enough that 
plaintiffs "need" an injunction against Northwest in order to 
obtain full relief. They must also have a right to such an 
injunction, and Rule 19 cannot provide such a right. See 28 
U.S.C. s 2072(b) ("[The Federal Rules of Civil Procedure] 
shall not abridge, enlarge or modify any substantive right."); 
Postal Workers, 665 F.2d at 1110 (holding that plaintiffs may 
not use Rule 19 to join employer in action against union 
unless plaintiffs show employer "to have been implicated in 
the union's breach of duty to its members").11

 Finally, the plaintiffs' briefs discuss at length the conten-
tion that President Retrum lacked both actual and apparent 
authority to sign the Bridge Agreement without membership 
ratification. That discussion, however, floats free of a tether 

__________
 11 Plaintiffs rely primarily on Evans v. Sheraton Park Hotel, 
503 F.2d 177 (D.C. Cir. 1974), which they contend permitted a 
plaintiff to join an international union in her civil rights action 
against sex-segregated locals, even though the international had "no 
part in the wrongdoing." Pl. Br. at 31. Far from having "no part 
in the wrongdoing," however, we held that the international had 
"maintained" the sex-segregated locals. Id. at 184. Moreover, the 
plaintiff in Evans, unlike the plaintiffs in the present case, had a 
cause of action (under 42 U.S.C. s 2000e-2(c)) against the party she 
sought to join under Rule 19. See id. at 184-86.


to any specified cause of action against Northwest. It may be 
that plaintiffs intend that discussion to bolster their breach of 
duty argument. As noted above, however, even on plaintiffs' 
own theory they must establish not merely that Retrum 
lacked authority (actual or apparent) to sign the Agreement, 
but that it was "objectively clear" or "obvious" to Northwest 
that he did. It may also be that plaintiffs intend their 
actual/apparent authority discussion to support their LMRA 
s 301 claim. But even if Retrum lacked authority to sign the 
Bridge Agreement, that would not alter the fact that section 
301 is inapplicable to employers and labor organizations sub-
ject to the RLA.

 The plaintiffs may also intend their argument that Retrum 
lacked actual or apparent authority to itself constitute some 
kind of cause of action against Northwest. If that is what 
they intend, however, they have failed to allege anything 
remotely resembling such a claim in either their initial or 
amended complaints. See App. 1-9, 461-69. It is far too late 
in the day to do so now. See Hoai v. Vo, 935 F.2d 308, 315 
(D.C. Cir. 1991). Accordingly we find nothing in plaintiffs' 
discussion of Retrum's authority to upset the district court's 
conclusion that plaintiffs are unlikely to prevail on the merits 
against Northwest.

 IV

 In light of our affirmance of the district court's conclusion 
that the plaintiffs are not likely to succeed on the merits, it 
would take a very strong showing with respect to the other 
preliminary injunction factors to turn the tide in plaintiffs' 
favor. See Murrow Furniture Galleries v. Thomasville Fur-
niture Indus., 899 F.2d 524, 527 (4th Cir. 1989). Plaintiffs 
have not made such a showing.

 Although they do not press a public interest argument on 
appeal,12 plaintiffs do contend that they will suffer irreparable 

__________
 12 Plaintiffs initially contended before the district court that 
there were "health and safety reasons" for granting a temporary 

injury in the absence of an injunction. Their principal con-
tention is that the HVTs increase the flight time required of 
flight attendants in a given duty period, while at the same 
time eliminating attendants' per diem pay and hotel allow-
ances because overnight stays are no longer required on such 
trips. Northwest replies that the attendants serving on such 
flights are those who affirmatively seek them because the 
turnarounds permit completion of a month's work in fewer 
work days. This dispute is not important, however, because 
the injury plaintiffs urge is in any event not irreparable. If 
plaintiffs ultimately succeed on the merits, this kind of injury 
can be remedied with money damages. See Sampson v. 
Murray, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of 
income, ultimately to be recovered, does not usually consti-
tute irreparable injury.").

 Plaintiffs also contend that implementation of the Bridge 
Agreement has caused the union irreparable injury by depriv-
ing it of a valuable bargaining chip in its current negotiations 
for a new collective bargaining agreement. See supra note 1. 
Any such injury, however, is mitigated by the Bridge Agree-
ment's express provision that the Agreement remains in 
effect only "for the duration of the current negotiations," and 
"that the terms of this Agreement shall operate without 
prejudice to either parties' [sic] position in any subsequent 
negotiation or arbitration." App. 67. Indeed, in reviewing 
the issue, the IBT General President found this to be the 
"most significant element of the settlement." Id. at 63. 
Moreover, if there were any such injury, it would have 
reciprocal application to Northwest: whatever bargaining 
advantage the union would lose to Northwest in the absence 
of an injunction, Northwest would lose to the union in the 
presence of one. See Serono Lab., 158 F.3d at 1326.13

__________
restraining order. They ultimately conceded, however, that this 
contention was "not supported on this record." App. 452-53.

 13 Plaintiffs also contend that the deprivation of their right of 
ratification itself constitutes irreparable injury, even apart from the 
collateral consequences discussed above. But this contention is 
inextricably linked to the merits: plaintiffs suffer such an injury 


 In sum, because plaintiffs have demonstrated neither likeli-
hood of success on the merits nor irreparable injury, the 
district court did not abuse its discretion in denying the 
motion for a preliminary injunction.

 V

 Finally, the IBT suggests as an alternative disposition that 
we vacate the district court's order and remand the case for 
consideration of its cross-claim for an injunction restoring the 
status quo prior to the Bridge Agreement.

 Under the Railway Labor Act, an adjustment board es-
tablished by the employer and the unions representing its 
employees has exclusive jurisdiction over "minor disputes," 
defined as those arising "out of grievances or out of the in-
terpretation or application" of existing collective bargaining 
agreements.14 Consolidated Rail Corp. v. Railway Labor 
Executives' Ass'n, 491 U.S. 299, 303 (1989) (quoting 45 
U.S.C. s 153 First (i)); see also id. at 304 n.4 (noting airline 
industry provision of 45 U.S.C. s 184); International Ass'n 
of Machinists v. Central Airlines, 372 U.S. 682, 687-89 
(1963). In the case of so-called "major disputes," however, 
the district courts have jurisdiction to enjoin violations of 
the status quo pending the completion of required bargain-
ing and mediation procedures. Consolidated Rail Corp., 491 
U.S. at 302-03; see 45 U.S.C. ss 152 Seventh, 155, 156. 
"Major disputes" are defined as those relating to "the for-
mation of collective agreements or efforts to secure them. 
They arise where there is no such agreement or where it is 
sought to change the terms of one, and therefore the issue 
is not whether an existing agreement controls the controver-
sy." Consolidated Rail Corp., 491 U.S. at 302 (quoting 
Elgin, Joliet & E. Ry. v. Burley, 325 U.S. 711, 723 (1945)).

__________
only if they in fact have such a right, a proposition they have not 
established.

 14 Suits for breach of the duty of fair representation are an 
exception. See Glover v. St. Louis-San Francisco Ry., 393 U.S. 
324, 328-29 (1969); Raus, 663 F.2d at 794.

 The IBT contends that the present case concerns a "major 
dispute," and that it is entitled to an injunction requiring 
Northwest to cease applying the Bridge Agreement pending 
completion of the required procedures. To establish that 
contention, the IBT must show that the dispute is not "argu-
ably justified by the terms of the parties' collective-
bargaining agreement." Id. at 307; see Air Line Pilots Ass'n 
v. Eastern Air Lines, 869 F.2d 1518 (D.C. Cir. 1989). What-
ever the merits of the IBT's position, it does not provide 
grounds for vacating the district court order currently before 
this court. The claim advanced by the IBT is different from 
those raised by plaintiffs. Because it was not filed until after 
the district court issued its order and after the plaintiffs filed 
their notice of appeal, the court did not--and did not have an 
opportunity to--rule on the merits of the IBT's claim. On 
remand, the parties will have a chance to present their 
arguments concerning this issue, and the court will have an 
opportunity to render a decision.

 VI

 The denial of plaintiffs' motion for a preliminary injunction 
is affirmed and the case is remanded to the district court.