**Elizabeth LEE et al., Plaintiffs,**

v.

**CHRISTIAN COALITION OF AMERICA, INC. et al., Defendants.**

**No. 01–0405(RMU).**

United States District Court, District of Columbia.

July 27, 2001.

George R.A. Doumar, Jon S. Nicholas, Dilworth Paxson PLLC, Washington, DC, for Plaintiffs.

Michael D. Hayes, Mary K. Qualiana, Michael D. Rothberg, Dow, Lohnes & Albertson, PLLC, Washington, DC, for Defendant Christian Coalition of America, Inc.

Robert F. Muse, Stein, Mitchell & Mezines, Washington, DC, for Defendant Roberta Combs.

*MEMORANDUM OPINION*

URBINA, District Judge.

### GRANTING IN PART AND DENYING IN PART THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### I. INTRODUCTION

Both sides in this racially charged case frame their positions with incendiary rhetoric. The plaintiffs, ten current and former African–American employees of the Christian Coalition of America ("the Coalition"), move the court for a preliminary injunction to prevent their employer from engaging in any retaliatory conduct toward them. The plaintiffs, all of whom work or worked in the data-entry or remittance departments of the Coalition's Washington, D.C. office, filed their complaint on February 23, 2001. They explain that they brought this "lawsuit in 2001 concerning Jim Crow-style racial discrimination." *See* Pls.' Reply ("Reply") at 16. The plaintiffs filed a first amended complaint on May 25, 2001. On July 5, 2001, the plaintiffs moved this court for a preliminary injunction, arguing that in retaliation for their lawsuit, the defendants[1] have cut their work hours dramatically, forcing several of them to quit.

Firing back, the Coalition contends that the plaintiffs' motion for a preliminary injunction "is merely an attempt to generate negative publicity against the Coalition and to force wide-ranging discovery prior to a ruling on defendants' dispositive motions to dismiss and accompanying motions to stay discovery." *See* Defs.' Opp'n to Mot. for Prelim. Inj. ("Defs.' Opp'n") at 1. The defendants argue that because the plaintiffs have made a relatively weak

---

1. In addition to the Coalition, the other defendant is Roberta Combs, the Executive Director of the Coalition.

showing in their motion for injunctive relief, the court should deny the plaintiffs' motion.

For the reasons that follow, the court will grant in part and deny in part the plaintiffs' motion for a preliminary injunction.

## II. BACKGROUND

### A. Factual History

Founded in 1989 by Pat Robertson "to give Christians a voice in government," the Christian Coalition "represent[s] a growing group of nearly 2 million people of faith to have a voice in the conversation we call democracy." *See http://www.cc.org/aboutcca/mission.html,* last visited on July 25, 2001. The Coalition, a non-profit corporation under section 501(c)(4) of the Internal Revenue Code, is incorporated under the laws of the Commonwealth of Virginia. *See* First Am. Compl. at 3.

In June 2000, the Coalition moved its headquarters from Chesapeake, Virginia to Washington, D.C. *See* Defs.' Opp'n at 7; First Am. Compl. at 3. To help staff its Washington office, the Coalition hired All-U–Need personnel, an employment agency. *See* Defs.' Opp'n at 8. When she was first hired in June 2000, Elizabeth Lee, an African–American woman, was an hourly employee of this agency and had no supervisory authority. In mid-November 2000, the Coalition offered her, and she accepted, a promotion to a salaried supervisory position, Remittance Manager. *See id.*

The other nine plaintiffs—Eboni N. Coatley-el, Monica Hagans, Latasha Lee, Lanae McCollum, Cynthia Moore, Tina M. Smith, Lisa J. Sutton, Norma Vaughn, and Marion R. Wilson—are all African–American women. Hired between June 2000 and January 2001, these nine plaintiffs work or worked at an hourly rate of pay between $6.50 and $8. *See* First Am. Compl. at 3. Elizabeth Lee earns a salary of $12 per hour. *See* E. Lee First Decl. at 3. Every plaintiff works or worked in the Coalition's remittance and data entry department. *See* First Am. Compl. at 3.[2] According to the defendants, the remittance and data processing department, which Elizabeth Lee supervises, is divided into two parts. *See* Defs.' Opp'n at 8. The department's main function is to process the mail containing contributions to the Coalition. *See id.* As the defendants explain:

> The duties of the plaintiffs who are, or were, in the Remittance division include counting the pieces of mail, opening them, and tabulating the total amount of the checks and/or cash received. When Remittance finished this processing, the mail was forwarded to Data Processing. The duties of the plaintiffs who were in the Data Processing division included entering the name and address of the contributor and total amount of the contribution into the Coalition database.

*Id.* (citing Cardenas Decl. at 2).

### B. Procedural History

On February 23, 2001, the plaintiffs filed their initial complaint. They alleged that the Coalition had a "front door/back door policy." *See* Compl. at 6. Specifically, they claimed that while white employees were allowed to use the front door, which leads into the reception area and is accessible to the public, black employees were instructed to use only the back door. *See id.* at 6–7. According to the plaintiffs, Roberta

---

**2.** In a companion case to the one at bar, *Martin v. Christian Coalition of America, Inc.,* Dkt. No. 01cv0497 (D.D.C.) (RMU), three former employees of the Washington office have sued the Coalition. Since the plaintiffs in the *Martin* case have not moved for a preliminary injunction, the court will not discuss the companion case in this Memorandum Opinion.

Combs, the Coalition's Executive Director, justified this policy by saying "that she did not want important people seeing the girls from remittance/data entry in the reception area." *See id.* at 8.

The African–American remittance/data entry employees also claimed that the Coalition maintained segregated kitchen and break facilities. *See* Compl. at 9. Whereas white employees were allowed to use the kitchen—which contained a refrigerator, microwave, dishwasher, bottled water service, coffeemaker, and television—the black remittance and data entry employees allegedly had to take breaks in a segregated break area "consisting of tables shoved against the wall of the remittance/data entry room." *See id.* at 9.

The plaintiffs also charged that the Coalition excluded black employees from the Christmas party and from events revolving around the inauguration of President George W. Bush, provided no health-care coverage to any of the black employees, and refused to pay the black employees overtime. *See* Compl. at 10–15.

The plaintiffs alleged that the defendants have violated the D.C. Human Rights Act, D.C.Code § 1–2501 *et seq.*, have violated the Fair Labor Standards Act, 29 U.S.C. § 2001 *et seq.*, and have committed intentional infliction of emotional distress. *See* Compl. at 16–19. On May 4, 2001, the defendants responded by filing a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) (lack of subject-matter jurisdiction) and 12(b)(6) (failure to state a claim). *See generally* Defs.' Mot. to Dis.

On May 25, 2001, the plaintiffs filed a first amended complaint. They now contend that after they filed this lawsuit, the "[d]efendants engaged in a course of conduct intended to force one or more Plaintiffs to resign." *See* First Am. Compl. at 15. Among other things, the plaintiffs

charge that before they filed their original complaint, the Coalition maintained a policy of paying a minimum of four hours pay when an hourly employee reported to work, even if there was insufficient work to perform. *See id.* at 16. After the employees filed their suit, however, the Coalition allegedly adopted a policy of refusing to pay them the four-hour minimum. *See id.*

The remittance and data-entry employees also assert that the previous requirement that each employee process a minimum of 300 transactions per day was increased to 2,000 transactions per day. *See id.* at 17. Moreover, the defendants' outside consultants allegedly told Elizabeth Lee that the plaintiffs would be allowed only one bathroom break per day, and "would be expected to type continuously from 9 am [sic] until lunchtime at 12:45." *See id.*

In addition to the counts alleged in the original complaint, the plaintiffs added two counts in their amended complaint: intentional racial discrimination in violation of 42 U.S.C. § 1981 on behalf of all the plaintiffs, and constructive discharge based on a hostile work environment on behalf of the four plaintiffs who allegedly had been forced to quit by the defendants' conduct. Through their briefs and the affidavits of employees, the defendants deny all charges of racial discrimination and retaliation.

### C. Background to the Motion for a Preliminary Injunction

In a nutshell, the plaintiffs contend that they need injunctive relief to prevent the defendants from engaging in unlawful retaliatory conduct toward the plaintiffs who are still employed at the Coalition or toward witnesses who have information that could help the plaintiffs' case. *See* Mot. for Prelim. Inj. at 1. Since they filed the

initial lawsuit, the plaintiffs argue that the "[d]efendants have gradually intensified pressure on Plaintiffs to resign." *See id.* Noting that only five out of the original 10 plaintiffs remained employed at the Coalition, the plaintiffs state that the defendants have sought to reduce the hours of the remaining four hourly plaintiffs to no more than a few hours per day. "Unless this Court takes prompt action, no Plaintiffs will remain employed at the Coalition as a result of Defendants' retaliation." *See id.* at 2.

Before they filed their suit, the plaintiffs maintained that they "regularly worked full days" in the remittance and data-entry departments. *See* Mot. for Prelim. Inj. at 2. After they filed their suit, however, the work in the office began to decrease and the work conditions allegedly grew more hostile, forcing some of the plaintiffs to resign. Only five plaintiffs remain at the Coalition: Elizabeth Lee, Lanae McCollum, Tina Smith, Lisa Sutton, and Marion Wilson. *See id.* at 3. "According to the Coalition, the work originally performed by ten full-time, hourly employees is now only sufficient to occupy four hourly employees at less than half-time, an estimated reduction in workload of 80%." *See id.* (citing E. Lee Decl. at 3).

On June 14, 2001, a memo from defendant Roberta Combs was distributed which was "purportedly meant to 'clarify'" that the regular workday for the hourly employees was from 9 a.m. to 12:30 p.m. each weekday. *See* Mot. for Prelim. Inj. at 3. The memo explained that there was "not enough work" to maintain a full-time schedule for the hourly employees. *See id.* The employees take issue with the Coalition's assertion that it has the right to "agree" with the hourly employees to a work schedule of less than four hours per day under D.C. law. *See id.* (citing D.C. Mun. Regs. Tit. 7, § 907.1). The employ-ees note that at three-and-a-half hours per day, they are grossing between $26.25 and $28 per workday. If the court accepted the defendants' logic, they argue, the defendants could continue to reduce the "assigned" work hours to one or two hours per day. *See id.* "Defendants are slowly forcing Plaintiffs['] pay down to a level where it is less than their commuting and child care costs." *See id.* at 3–4.

A key point in the dispute is the plaintiffs' contention that the volume of work has not decreased by 80 percent. *See* Mot. for Prelim. Inj. at 4. Rather, the plaintiffs claim, the defendants "began implementing a scheme" to reassign work "secretly" from the plaintiffs to the single white employee in the remittance area, and to other employees who had never done remittance or data-entry work before. *See id.* In her declaration, Elizabeth Lee says that on June 20, 2001, she found signed documentation showing that "Walter ('Rob') Schmidt, the single white employee in remittance, Arlynn Gray, and Tracy Ammons, had been performing data entry work on June 19, after the black hourly employees who are Plaintiffs left the office." *See* E. Lee Decl. at 5. Ms. Lee states that because the data-entry work was beginning to pile up, she called Ms. Combs at about 12:20 p.m. on June 20, 2001 to ask her if the black employees could stay after 12:30 p.m. to finish the work, but that Ms. Combs refused. *See id.* Ms. Combs "said she had somebody else to do the work. I had to stay and show and tell Tracey [sic] Ammons and Arlynn Gray how to do the work." *Id.*

The employees contend that Mr. Ammons, the Human Resources Director, does not have any responsibility for remittance and data-entry work. *See* E. Lee Decl. at 6. Elizabeth Lee also states that Rob Schmidt came to her on the morning of June 21, 2001 and asked her to apolo-

gize for him to the black hourly employees for doing work that they could be doing. *See id.* She added that despite Roberta Combs's statement that Rob Schmidt was performing the remittance and data-entry work as a volunteer, Rob Schmidt told Elizabeth Lee that the Coalition was paying him to do the work. *See id.*

The second principal point of contention revolves around the Coalition's hiring of an outside consultant, Campaign Mail and Data, Inc. ("CMDI"), to do the data-entry work. On July 2, 2001, Elizabeth Lee noticed that 12 shelves that had previously been filled with data-entry work to be performed just a week before were now empty. *See* E. Lee Decl. at 7. She learned the next day that the work had been sent to CMDI for data entry. *See* Mot. for Prelim. Inj. at 5.

To further support their motion for a preliminary injunction, the plaintiffs include declarations from three former Christian Coalition employees: Trent Barton, Candace Wheeler, and Joel Garrett.[3] Mr. Barton, a white man who worked at the Coalition from about December 26, 2000 to February 27, 2001, said he learned that the Coalition prohibited African-American employees who worked in remittance and data entry from using the "front door" into the Coalition's reception area. *See* Barton Decl. at 1. "When I asked an employee why this policy existed, I was told that Roberta Combs did not want 'important people' to see the girls from the back." *Id.* He also learned that the Coalition prohibited these employees from using the kitchen, and that Candace Wheeler—a white employee who began working at the Coalition in December 2000—was receiving health insurance benefits, while Elizabeth Lee was not. *See id.* at 2. Finally, Mr. Barton says he was fired because

he refused to spy on his co-workers. As he explains:

> On or about Thursday, February 22, 2001, Tracy Ammons asked me to enter the remittance/data entry room and eavesdrop on the African–American employees.... On Monday, February 26, 2001, I told Tracy Ammons that I was unwilling to eavesdrop or spy on fellow employees. On the evening of February 27, 2001, at approximately 10:30 p.m., Tracy Ammons phoned me and told me that my services at the Coalition were no longer needed. Mr. Ammons said to me that he knew I would not cause trouble for the Coalition, since I was a good Christian and [a] man of integrity. I took his statement to mean that any support for the racial discrimination lawsuit would be contrary to my religious and ethical beliefs as a Christian.

Barton Decl. at 3.

Candace Wheeler, a white woman who served as Director of Membership Services at the Coalition from December 12, 2000 to April 30, 2001, also states that the Coalition had a "back door" policy for the African–American employees. *See* Wheeler Decl. at 1–2. She says she learned that none of the black employees had been invited to the office's Christmas party in December 2000, and that they were regularly excluded from other office social events. *See id.* at 2. Ms. Wheeler explains that "[u]pon learning these facts, I became very concerned that the leadership of the Coalition was intentionally discriminating against the black women who worked for the Coalition. It is contrary to my beliefs as a Christian to treat persons as lesser human beings because of their race." *See id.* at 3. Lastly, Ms. Wheeler said that at several prayer meetings after the plaintiffs

---

3. Mr. Barton is a plaintiff in the companion case, *Martin v. Christian Coalition of America,* *Inc.,* Dkt. No. 01cv0497 (D.D.C.) (RMU). Ms. Wheeler and Mr. Garrett are not.

filed their lawsuit, "Roberta Combs told the group that she and Pat Robertson were anointed of God. Mrs. Combs stated that she felt sorry for anyone who crossed them because 'God would deal with them.'" *See id.*

Lastly, Joel Garrett—who describes himself as "a Christian who generally agrees with the Coalition's political goals"—worked for the Coalition around the time of the Republican National Convention in the summer of 2000. *See* Garrett Decl. at 1. During his time with the Coalition, he does not recall "ever observing the black employees from remittance using the front door through the reception area. The only places I would see these black employees was in the remittance room or the storage room." *See id.* at 3.

In response, the Coalition and Ms. Combs vigorously refute the allegations of unlawful retaliation. They note that the decline in the Coalition's contributor mail since December 2000 (about 73 percent) "was probably the result of several factors, including the end of the presidential election cycle and plaintiffs' incompetence in entering data, which resulted in numerous complaints from contributors due to too frequent solicitation." *See* Defs.' Opp'n at 9 (citing Decl. of CMDI President John Simms at 5–6).

Moreover, in seeking to support their assertion that the court should deny the plaintiffs' motion because the plaintiffs have unclean hands, the defendants charge that plaintiff Elizabeth Lee engaged in mismanagement, misconduct, and nepotism. They state that after she assumed the supervisory position in November 2000, Ms. Lee hired plaintiffs Monica Hagans and Tina Marie Smith. *See* Defs.' Opp'n at 9. Moreover, although the Coalition suffered a 16 percent decline in incoming mail between December 2000 and January 2001, after all the discriminatory events alleged in the initial complaint had supposedly occurred, Ms. Lee hired three new employees in late January 2001: "plaintiff Latasha Whitfield–Lee (apparently her sister-in-law), plaintiff Lanae McCollum (plaintiff Monica Hagens' roommate), and plaintiff Norma Vaughn." *See id.* (citing Cardenas Decl. at 3). Seeking to cast doubt on the plaintiffs' overall case, the defendants note that "[w]ithin three weeks, each of these new employees joined the lawsuit, each claiming she was the victim of widespread discrimination. These same employees are now claiming retaliation because their work hours have declined." *See* Defs.' Opp'n at 9.

In terms of its use of the outside vendor, the Coalition explains that from June to September 2000, CMDI provided on-line data services to the Coalition. Although it ceased its relationship with CMDI in September 2000, the Coalition resumed its business relationship with CMDI in March 2001. At that point, the Coalition gave copies of all the data previously entered to CMDI, which attempted to integrate it with its existing Coalition database. *See id.* at 10. According to the defendants, "CMDI discovered that the data was incomplete, severely corrupted, and rife with duplicative entries.... CMDI discovered that the poor quality of the work done by the Coalition's data processing staff was the primary source of the data problems." *Id.; see also* Decl. of Coalition employee Susan Floyd at 2–3 (stating that the data processing staff performed well below industry standards, that many were poor typists who use the "hunt and peck" typing system, and that they were not willing to complete even the most basic tasks). In addition, CMDI President John Simms says the remittance staff's work product was "as deficient as the work product of the data entry staff." *See* Simms Decl. at 5. He adds that the data entry staff's

failure to properly maintain the development database may be partially responsible for the decrease in the mail volume experienced by the Coalition since December 2000. *See id.* at 5–6.

In the defendants' view, the Coalition made a legitimate business decision to farm out the data entry work to an outside vendor since the Coalition's data entry staff could not handle it in a satisfactory manner. Accordingly, starting on June 25, 2001, "in light of the resignations, no shows, and incompetence of the Coalition's data processing personnel, the Coalition stopped using its personnel to do data entry." *See* Defs.' Opp'n at 11. The vendor now enters all data on its own directly from the remittance data prepared by the Coalition. *See id.*

In terms of some of the other allegations by the plaintiffs, the defendants offer their version of the facts. For example, Cecelia Cardenas, Mrs. Combs's personal assistant, explains that Ms. Lee's supervisors refused to allow the African–American employees to work past 12:30 p.m. because the Coalition felt the employees should have been able to complete the processing of the day's mail during regular work hours. *See* Cardenas Decl. at 5. "On those occasions when the Remittance and Data Processing employees dragged their feet and did not complete the mail during their regular hours, other employees at the Coalition helped complete the work." *See* Cardenas Decl. at 5.

Meanwhile, in their reply brief, the plaintiffs hone in on the fact that the defendants reintroduced CMDI into the Coalition's operation in March 2001, "just weeks after this lawsuit was filed." *See* Reply at 1. The African–American employees cite the sudden re-appearance of CMDI and the "immediate overhaul and outsourcing of work" as prima-facie evidence of retaliation. *See id.*

The plaintiffs also call attention to the fact that the defendants rely on Cecelia Cardenas's declaration more than any other even though she was not hired as Ms. Combs's assistant until March 2001, after the lawsuit was filed, and thus lacks personal knowledge of the many events about which she claims to have "personal knowledge." *See* Reply at 2.

■ In addition, the plaintiffs charge that the defendants have now changed their retaliatory strategy by instructing Rob Schmidt—the white employee in remittance who had previously been instructed to do some of the African–American employees' work—not to work past 12:30 p.m. anymore. *See id.* at 3. Instead, Elizabeth Lee says she is "expected to complete all of the work myself. I have been told to stay each evening until the work is done, work that used to be performed by the hourly employees."[4] *See* E. Lee Second Decl. at 4–5. The plaintiffs contend that "[b]y imposing this excessive work schedule on one salaried person, who is not being paid overtime, the Coalition may also compel Elizabeth Lee to quit due to

---

4. The plaintiffs included three new declarations in their reply brief and asked the court for leave to file these three supplemental declarations. In response, the defendants filed a surreply brief along with a motion for leave to file the surreply brief. A court may grant a party's motion to file a surreply if the moving party shows that the reply brief raised new arguments that were not included in the original motion. *See Alexander v. Federal Bureau of Investigation,* 186 F.R.D. 71, 74 (D.D.C. 1998) (granting motion for leave to file a surreply where the reply included a declaration that was not included in the original motion, and that raised "matters presented to the court for the first time"). Accordingly, in this case, the court will grant both the plaintiffs' motion for leave to file the supplemental declarations and the defendants' motion for leave to file a surreply.

the hostile work conditions." *See* Reply at 3–4.

Elizabeth Lee also contends that previously, neither the Coalition nor CMDI complained about the procedures used to complete the Coalition's data-entry work, and that the same procedures have been in place since June 2000. *See* E. Lee Second Decl. at 5. She also notes that because of computer problems, no data-entry work was done from September to November, 2000. *See id.* at 1. And contesting the defendants' assertion that she unilaterally decided to hire people, Elizabeth Lee notes that in November 2000, Roberta Combs asked her to find more employees to clear up the data-entry backlog. *See id.* at 2. Moreover, she disputes the accusation of employee incompetence by pointing out that Coalition employee Allyson Plathe gave all of the remittance and data-entry employees a typing test in late 2000, and all but one employee passed. *See id.* Finally, she declares that "[a]t no time have I had the authority to hire employees for my section without the approval of Tracy Ammons (and, ultimately, Roberta Combs)." *Id.* Mr. Ammons conducts the job interviews and makes the hiring decisions. *See id.*

The plaintiffs also take issue with the charges of nepotism. Plaintiff Lanae McCollum, a Coalition employee from January 2001 to the present, states that she has never been a roommate or lived with plaintiff Monica Hagans. *See* McCollum Decl. at 1. When she was looking for work, she asked Ms. Hagans, a longtime friend, to take a resume to the Christian Coalition and see if they were hiring. *See id.* Ms. McCollum states, "Tracey [sic] Ammons interviewed me for the position in remittance and I was hired." *See id.*

In addition, plaintiff Latasha Lee, a Coalition employee from January to May 2001, states that contrary to the defen-

dants' submission, she is not Elizabeth Lee's sister-in-law, but that Elizabeth Lee is a cousin of her husband. *See* L. Lee Decl. at 1. Furthermore, she did not meet Elizabeth Lee until she applied for work at the Coalition, after her mother-in-law informed her that the Coalition was hiring. Tracy Ammons asked her to complete the paperwork for the application process and hired her. *See id.* at 1–2. She quit her job in part because of the reduced hours and in part because of what she judged to be a hostile work environment. *See id.* at 2–3. "During the time I worked at the Coalition, no one told me that I was performing remittance work improperly." *Id.* at 3.

Finally, the defendants' surreply adds little in terms of new factual assertions, with the exception being the observation that the plaintiffs' own complaint lists plaintiffs Monica Hagans and Lanae McCollum as having the same address. *See* Surreply at 14 n. 17.

### D. Plaintiff Tina Smith's Conduct

The last major factual point of contention concerns plaintiff Tina Smith's conduct on the morning of June 21, 2001. At about 10 a.m. that day, Ms. Smith became involved in a dispute with Maria Trejos, the cashier at the American Café, a restaurant located in the basement of the building where the Coalition rents space. *See* Defs.' Opp'n at 12.

The parties dispute who initiated the altercation. The plaintiffs characterize the episode as "Maria's verbal assault on Tina Smith." *See* E. Lee Decl. at 6. Elizabeth Lee, a witness to the dispute, says that when Tina Smith complained that Ms. Trejos was being rude to her by asking whether she had one or two eggs on her croissant, Ms. Trejos responded by saying she complained too much and called her a "bitch." *See id.* On the other hand, the

defendants contend that Ms. Smith "verbally assaulted the female cashier" and that during the course of the incident, Ms. Smith "snatched the money she had paid, threatened to 'kick the ass' of the cashier, and further threatened to wait for her after work to commit the assault." *See* Defs.' Opp'n at 12 (citing Trejos Decl. at 2–3). Moreover, the defendants maintain that even though a restaurant employee told Ms. Smith not to return to the premises, she returned and had an argument the next day, this time with the manager. *See id.*

Gloria Waul, a co-worker at the American Café and an eyewitness, supports Ms. Trejos's version of the facts. In addition, Ahmed Mohamed, the owner and operator of the restaurant, states that although he did not observe the incident firsthand, when he returned to the restaurant, Ms. Trejos was "crying and shaken." *See* Mohamed Decl. at 1. He adds that during the time he has known Ms. Trejos, "I have never known her to curse or threaten anyone." *See id.* at 3.

After learning of the incident, Mr. Mohammed went to the Coalition's office in the building to complain about the conduct of the Coalition's employee. *See id.* at 2. Later that day, the Coalition's representatives interviewed Mr. Mohammed and Ms. Waul. The defendants explained that based on these interviews with third-party witnesses, "the Coalition did the responsible thing: it suspended Ms. Smith [without pay] pending an investigation." *See* Defs.' Opp'n at 12. It also advised Ms. Smith's counsel that it would welcome the opportunity to interview her. According to the defendants, plaintiffs' counsel did not respond to this request.[5] *See id.*

**E. Requested Injunctive Relief**

Based on their allegations, the plaintiffs ask the court to order the Coalition to restore the work assignments which prevailed before they filed this lawsuit and to allow the remaining five plaintiffs (Elizabeth Lee, Tina Smith, Lee Sutton, Marion Wilson, and Lanae McCollum) to complete their work. Specifically, the plaintiffs move the court to prohibit the defendants from reassigning work that was routinely performed by the African–American remittance and data-entry employees to any outside consultants, to salaried employees, or to hourly white employees pending this suit's resolution. *See* Mot. for Prelim. Inj. at 2. "Unless Defendants show cause, Plaintiffs should be entitled to work the original work schedule of 9 a.m. to 4:30 p.m. each day (provided that there is work available) and should be guaranteed a minimum of four hours pay per [workday], in accordance with D.C. law." *See id.* Moreover, the plaintiffs ask the court to order the reinstatement of plaintiff Tina Smith and to guarantee her a minimum of four hours paid work per day. *See* Mot. for Prelim. Inj., Pls.' Proposed Order.

In response, the defendant argues that the plaintiff has failed to make the requisite showing to justify the court's issuance of injunctive relief. With regard to every plaintiff still employed by the Coalition except Tina Smith, the court disagrees.

**III. DISCUSSION**

**A. Legal Standard for Injunctive Relief**

█ This court may issue a preliminary injunction only when the movant demonstrates that:

---

5. In its opposition, the Coalition states that based on its further investigation and the sworn declarations of the American Café workers, the Coalition believes that Ms. Smith's actions warrant her termination and intended to notify her counsel of this personnel action shortly. *See* Defs.' Opp'n at 12 n. 6.

(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction.

*Davenport v. International Bhd. of Teamsters,* 166 F.3d 356, 361 (D.C.Cir.1999); *see also World Duty Free Americas, Inc. v. Summers,* 94 F.Supp.2d 61, 64 (D.D.C. 2000). These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted. *See CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995). Rather, the factors "interrelate on a sliding scale and must be balanced against each other."[6] *Davenport,* 166 F.3d at 361 (citing *Serono Labs. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir.1998)); *see also WMATC v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977) (court "examines each requirement in light of the others to determine whether an injunction would be proper").

■ Thus, a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors. *See Serono Labs.,* 158 F.3d at 1318. For instance, as to the first factor, "[t]he court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, [the court] may grant [an injunction] even though its own approach may be contrary to [the movants'] view of the merits. The neces-

sary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *New Mexico v. Richardson,* 39 F.Supp.2d 48, 50 (D.D.C.1999) (quoting *Holiday Tours,* 559 F.2d at 843).

■ A strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing on the other three factors. *See Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958) ("injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits."); *National Wildlife Fed'n v. Andrus,* 440 F.Supp. 1245, 1256 (D.D.C. 1977) (enjoining further construction on dam power plant, despite dispute over irreparable injury, because "the court is convinced by plaintiffs' argument on the merits and therefore finds it sufficient on the question of irreparable injury . . .").

■ If the plaintiff makes a particularly weak showing on one factor, however, the other factors may not be enough to "compensate." *See Taylor v. RTC,* 56 F.3d 1497, 1506 (D.C.Cir.), *amended on other grounds on reh'g,* 66 F.3d 1226 (D.C.Cir. 1995). It is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits. *Cf. Benten v. Kessler,* 505 U.S. 1084, 1085, 112 S.Ct. 2929, 120 L.Ed.2d 926 (1992) (*per curiam*); *University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 68

---

**6.** When a party seeks an injunction to reverse policies that are already in place, "the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *See Columbia Hosp. for Women Found. v. Bank of Tokyo–Mitsubi-*

*shi, Ltd.,* 15 F.Supp.2d 1, 4 (D.D.C.1997) (citation omitted), *aff'd,* 159 F.3d 636 (D.C.Cir. 1998) (table, text in Westlaw); *see also Alaska Excursion Cruises, Inc. v. United States,* 595 F.Supp. 14, 18 (D.D.C.1984) (attempt to alter *status quo,* rather than preserve it, must be supported by showing that "the facts and law clearly support" such a change).

L.Ed.2d 175 (1981); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 934, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). If the plaintiff fails to make this showing, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport*, 166 F.3d at 366; *see, e.g.*, *National Pharm. Alliance v. Henney*, 47 F.Supp.2d 37, 41 (D.D.C.1999) ("Here, because the likelihood of success is slim, plaintiffs would have to make a very substantial showing of severe irreparable injury in order to prevail on their motion."). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *American Bankers Ass'n v. National Credit Union Admin.*, 38 F.Supp.2d 114, 141 (D.D.C.1999) (quoting *Holiday Tours*, 559 F.2d at 843).

In addition, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown. *See National Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C.Cir.1990) (citation omitted).

▆▆▆ Finally, because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. *See Mylan Pharms., Inc. v. Thompson*, 139 F. Supp.2d 1, 17 (D.D.C. 2001) (Urbina, J.); *Moore v. Summers*, 113 F.Supp.2d 5, 17 (D.D.C.2000). Although the trial court has the discretion to issue or deny a preliminary injunction, it is not a form of relief granted lightly. *See Ambach v. Bell*, 686 F.2d 974, 979 (D.C.Cir. 1982). As the Supreme Court has said, "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be

granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

## B. Injunctive–Relief Analysis

In this case, the court determines that all the plaintiffs except Ms. Smith make a strong showing on all four factors that the court must consider in the injunctive-relief analysis. In short, the plaintiffs have shown that they are likely to prevail on the merits of their case, they would suffer irreparable harm if an injunction is not issued, the balance of the equities favors the plaintiffs, and issuance of a preliminary injunction would serve the public interest.

## 1. The Plaintiffs Have a Strong Likelihood of Success on the Merits

▆▆▆ In their motion for a preliminary injunction, the plaintiffs argue that they have a strong likelihood of success on the merits of their unlawful-retaliation claim.[7] To assess the strength of the plaintiffs' claim that the defendants unlawfully retaliated against them for complaining of discriminatory treatment, the court applies the familiar *McDonnell Douglas* test used in cases involving claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.2000e *et seq.* ("Title VII"). "The methods and order of proof applicable to a claim of disparate treatment under Title VII apply equally under Section 1981." *See Richardson v. National Rifle Ass'n*, 871 F.Supp. 499, 502 (D.D.C.1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

---

**7.** The court agrees with the defendants that since the plaintiffs seek to stop the alleged unlawful retaliation by the defendants, the focus of the likelihood-of-success analysis should be on the retaliation claim alone.

### a. The *McDonnell Douglas* Framework

To prevail on a claim of race discrimination or retaliation under Title VII, a plaintiff must follow a three-part burden-shifting analysis. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The Supreme Court has explained this scheme as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.... The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817 (citations omitted)).

Thus, the plaintiff must first establish a prima-facie case of prohibited discrimination or retaliation. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C.Cir.1998) (*en banc*). To demonstrate a prima-facie case of retaliation, the plaintiff must establish that: (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse personnel action against her; and (3) there is a causal link between the adverse action and the protected activity. *See Jones v. Washington Metro. Area Transit Auth.,* 205 F.3d 428, 433 (D.C.Cir.2000).

If the plaintiff succeeds in making a prima-facie case, the burden shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for its action. The employer's burden, however, is merely one of production. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* If the employer is successful, the burden shifts back to the plaintiff to show that the defendant's proffered reasons are pretextual and that unlawful discrimination was the real reason for the action. *See McDonnell Douglas,* 411 U.S. at 802–805, 93 S.Ct. 1817; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The defendant's explanation of its legitimate reasons must be "clear and reasonably specific" so that the plaintiff is "afforded a full and fair opportunity to demonstrate pretext." *See Burdine,* 450 U.S. at 258, 101 S.Ct. 1089 (citation omitted). A subjective reason can be legally sufficient, legitimate, and nondiscriminatory if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion. *See id.*

Once the defendant carries its burden of articulating a "legitimate, nondiscriminatory reason" for the adverse action, the plaintiff must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for unlawful discrimination or retaliation. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "That is,

the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence' " and that the plaintiff's membership in a protected class was the true reason for the employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089); *see also Aka,* 156 F.3d at 1290; *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1554 (D.C.Cir.1997).

Both the Supreme Court and the D.C. Circuit have held that the burden-shifting scheme becomes irrelevant once both parties have met the burdens discussed above. *See Reeves,* 120 S.Ct. at 2106; *Aka,* 156 F.3d at 1289. At that point, the relevant inquiry is whether there is sufficient evidence from which a reasonable trier of fact could find in favor of the plaintiff, although "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." *See Reeves,* 120 S.Ct. at 2106 (citing *Burdine,* 450 U.S at 255 n. 10, 101 S.Ct. 1089); *see also Aka,* 156 F.3d at 1290; *Mungin,* 116 F.3d at 1554. In *Aka,* the D.C. Circuit found that the plaintiff had presented no evidence directly suggesting discrimination, but instead presented evidence that the defendant's proffered justification was false. The *Aka* court ruled that simply casting doubt on the employer's proffered justification did not automatically enable the plaintiff to survive summary judgment. *See Aka,* 156 F.3d at 1290–91. Rather, "the plaintiff's attack on the employer's explanation must always be assessed in light of the total circumstances of the case." *Id.* at 1291.

In sum, once an employer has met its burden of advancing a nondiscriminatory reason for its actions, the focus of proceedings at summary judgment:

will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*See Aka,* 156 F.3d at 1289.

In *Reeves,* the Supreme Court reaffirmed the principles set forth in *Aka.* Mandating a case-by-case approach, the Supreme Court instructed district courts to examine a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *See Reeves,* 530 U.S. 133, 120 S.Ct. at 2108; *see also Aka,* 156 F.3d at 1289.

Applying these legal standards to the instant case, the court proceeds with its analysis.

### b. The Plaintiffs' Claim of Unlawful Retaliation

The defendants make two main points in arguing that the plaintiffs have failed to demonstrate a prima-facie case of retaliation. First, the defendants argue that the plaintiffs cannot establish an adverse personnel action. *See* Defs.' Opp'n at 24. According to the defendants, the plaintiffs have failed to demonstrate the requisite "significant change" in employment status because the Coalition has

maintained a consistent work-hours policy during the period of the plaintiffs' employment. *See id.* at 24–25. The court rejects this notion out of hand. If the plaintiffs' hours dropped from 37½ hours per week to about 17 ½ hours per week, this decrease constitutes a "significant change" in employment status. Even assuming *arguendo* that the defendants' official policy on the books was for the plaintiffs to work only until all the data entry and remittance work had been completed, the defendants themselves do not dispute that before the lawsuit, the plaintiffs' average day *actually* ran from about 9 a.m. to 4:30 p.m., or 7½ hours. A cut in pay of more than 50 percent qualifies as a "significant change" in a person's employment status.

■ Second, in terms of causation, the defendants argue that given the "substantial time lapse" of about four months between the filing of the plaintiffs' complaint and the plaintiffs' alleged adverse employment action, the plaintiffs have failed to establish a sufficient causal connection between the filing of their complaint and the Coalition's alleged retaliatory reduction of their hours. *See* Defs.' Opp'n at 27. First, the court does not deem four months to be an unduly long lapse of time. Second, the defendants ignore the fact that the plaintiffs filed their original complaint on February 23, 2001, and that only a few weeks later in March 2001, the Coalition brought in an outside vendor to begin doing some of the plaintiffs' work. Third, the defendants omit the fact that on May 25th, the plaintiffs filed an amended complaint and that in June 2001, the Coalition began drastically cutting down the plaintiffs' hours. The plaintiffs are likely to persuade the jury that there is a causal connection between the filing of their complaint and the adverse action. Accordingly, the court holds that the plaintiffs have

established a prima-facie case of unlawful retaliation.

Under the *McDonnell Douglas* test, the burden now shifts to the defendants to offer a legitimate, non-discriminatory reason for the reduction in their employees' hours. The defendants meet their burden by stating that because of the substantial drop in incoming mail after the 2000 election cycle, the Coalition had less mail for the plaintiffs to process. *See* Defs.' Opp'n at 25. In addition, because of the plaintiffs' alleged incompetence in handling the mail, the Coalition outsourced more of the work and transferred the data-processing functions to an outside vendor for business reasons.

■ The third phase of the *McDonnell Douglas* test requires the plaintiffs to present enough evidence to allow a reasonable jury to infer unlawful retaliation, if this case were at the summary-judgment stage. The plaintiffs easily meet this burden. In addition to their prima-facie case, the plaintiffs present compelling evidence that the Coalition's black employees were treated differently from the white employees, and that this disparate treatment stemmed from the black employees' filing of the lawsuit. The court is inclined to find the declarations of Trent Barton, Candace Wheeler, and Joel Garrett credible on these points. Based on the record to date, a reasonable jury could clearly conclude that white employees were allowed to work longer hours than the black employees, who were told they had to finish by 12:30 p.m.

The idea—as the defendants would have the court believe—that the Coalition's Director of Human Resources "volunteered" to do the data-entry work strains credulity, to say the least. And the fact that Rob Schmidt, the lone white employee in the remittance department, apologized to Elizabeth Lee after he was allowed to continue

doing work after 12:30 p.m. could also be seen to weaken the defendants' claim of a legitimate, non-retaliatory reason for their personnel action. Similarly, even though the outside vendor now voices criticism of the data-entry work, a jury could conclude that the defendants' explanation that the plaintiffs' work was so poor that it was forced to outsource work to CMDI is far too convenient and perhaps contrived, based on the timing of the outsourcing and the undisputed statements in the plaintiffs' declarations that none of the Coalition's employees ever voiced any criticism about the quality of the data-processing work.

In sum, at this point, the plaintiffs have presented a very strong claim of unlawful retaliation that would allow them to survive a possible motion for summary judgment.

## 2. The Plaintiffs Will Suffer Irreparable Harm If the Preliminary Injunction Is Not Granted

■ The defendants contend that the plaintiffs will not suffer irreparable harm if the preliminary injunction is denied because the gravamen of the plaintiffs' motion for injunctive-relief is a claim for money damages. *See* Defs.' Opp'n at 20 (citing *Pinckney v. Board of Educ.*, 920 F.Supp. 393, 400 (E.D.N.Y.1996)). In essence, the defendants maintain that the plaintiffs' irreparable-harm claim boils down to the assertion that "they are not earning as much money as they would like—injury that is, by definition, entirely compensable by monetary damages." *See id.* at 2.

But the defendants misconstrue the relevant case law. On the one hand, the court agrees that it is well-settled that economic loss alone will rarely constitute irreparable harm. *See Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C.Cir.1985); *Barton v. District of Columbia*, 131 F.Supp.2d 236, 247 (D.D.C.2001) (Urbina, J.). In the

business context, however, the well-settled exception to the rule is that if the potential harm could threaten the very existence of the business, a court may deem such harm irreparable. *See, e.g., Wisconsin Gas Co.*, 758 F.2d at 674. Similarly, while an employer's discharge or constructive discharge of an employee will rarely constitute irreparable harm, courts routinely make exceptions when an employee is so poor that if she stopped working, the consequences would be severe. For instance, in *Hamlyn v. Rock Island County Metro. Mass Transit District*, the court held that:

> The rule is clear: monetary loss does not constitute an irreparable injury because a successful plaintiff can be adequately compensated at the conclusion of the litigation. There are four possible exceptions to this rule: (1) the plaintiff is so poor that he would be harmed in the interim by the loss of the monetary benefits; (2) the plaintiff would be unable to finance his lawsuit without the money he wishes to recover; (3) the damages would be unobtainable from the defendant because it will be insolvent prior to the final judgment; and (4) the nature of the plaintiffs' loss may make damages very difficult to calculate.

960 F.Supp. 160, 162 (C.D.Ill.1997) (citing *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1994)) (internal citations omitted); *see also Chapman v. South Buffalo Railway Co.*, 43 F.Supp.2d 312, 318 (W.D.N.Y.1999); *Williams v. State Univ. of N.Y.*, 635 F.Supp. 1243, 1248 (E.D.N.Y.1986) ("the plaintiff must quite literally find himself being forced into the streets or facing the spectre of bankruptcy before a court can enter a finding of irreparable harm.").

In this case, the four remaining hourly plaintiffs have demonstrated that because they are so poor, the loss of their jobs would rise to the level of irreparable harm.

In describing themselves, the plaintiffs note that they are "subsistence employees, who need their meager wages to support their families.... They may have great difficulty finding other work to avoid insolvency, eviction, and even to obtain food." *See* Mot. for Prelim. Inj. at 14. For the four remaining hourly employees, a workday of 3½ hours at $7.50 per hour amounts to a daily take of $26.25, which equals $131.25 per week, or $6,825 per year (assuming no time off). This yearly pay falls well below the federal poverty line.

In further support of their argument, the plaintiffs include declarations explaining how they would suffer irreparable harm if they no longer worked. Plaintiff Lisa Sutton explains that "[a]s a result of the Coalition's deliberate reduction in my work, I have experienced difficulty paying utility bills, and have had difficulty paying my rent on time. Unless the court orders the Coalition to return me to the work hours and rules that existed before the lawsuit, there is a substantial risk that I will lose my housing for me and my seven children." *See* Sutton Decl. at 2. She adds that she has applied for food stamps to ease the present situation, but cannot receive any benefits until 30 days after her application. *See id.* In her declaration, plaintiff Marion Wilson states that unless the court grants the plaintiffs' motion, she will be forced to quit her job because she will be unable to support her grandchild. *See* Wilson Decl. at 3.

Plaintiff Tina Smith submits that she has also had trouble paying utility bills and fears she "will be unable to pay [the] rent." *See* Smith Decl. at 2. She added that as of July 13, 2001, she would no longer be able to pay for day care provided by social services for her children. *See id.* at 3. Lastly, plaintiff Lanae McCollum states that because the defendants reduced her hours, on some days she does not have enough money to commute to and from work. *See* McCollum Decl. at 2. She adds that "I cannot feed and clothe my children on the wages I am earning from the Coalition, and I do not know when I will be able to find other work." *See id.* at 3.

In sum, the remaining hourly plaintiffs have made an undisputed showing that they are subsistence employees. Accordingly, they have more than adequately described the irreparable harm they would suffer if the court does not grant them preliminary injunctive relief. The inability to pay utility bills or to feed one's children or the risk of being evicted from one's home, amounts to irreparable injury that money damages cannot remedy. The essential logic underpinning the exception to the rule that monetary damages alone do not amount to irreparable harm is that a poor person who faces a discharge from her job would very likely incur injuries—such as those mentioned above—that are not compensable by money damages. Quite simply, since being evicted or being unable to feed a child are the types of injuries that are often incalculable, injunctive relief may be appropriate in these cases.

The court makes clear that its holding on this point should be narrowly construed. A middle-class person facing an employment discharge who would be unable to pay off the entire balance on his credit card bill each month would not have made a showing of irreparable harm. Clearly, this is not the case here. Thus, the court deems the defendants' statement that "every employment retaliation case would be the subject of preliminary injunctive relief" to amount to total hyperbole. *See* Defs.' Opp'n at 16.

There is a second reason why the hourly plaintiffs have met their burden of demonstrating irreparable harm. If the court did not grant an injunction, some plaintiffs

might have to go on welfare, or Temporary Assistance to Needy Families ("TANF"), 42 U.S.C. § 601 *et seq.* Enacted in 1996, TANF has as one of its "express statutory purposes... to 'end the dependence of needy parents on government benefits by promoting job preparation, work and marriage.'" *See Reynolds v. Giuliani*, 35 F.Supp.2d 331, 333 (S.D.N.Y.1999). TANF also established a five-year lifetime limit on benefits, with the expectation being that recipients would land jobs to support their children and themselves. *See* 42 U.S.C. § 608(a)(7). Seizing on this point, plaintiff Lisa Sutton says "I understand that current public assistance rules limit a person's eligibility to sixty months over their entire lifetime. Therefore, if I am forced to rely upon public assistance to support my children, I will permanently lose some of my eligibility for future assistance." *See* Sutton Decl. at 2–3.

 On this matter of first impression, the court agrees with the plaintiffs. If the court did not grant the plaintiffs' motion for injunctive relief, the plaintiffs might well be forced to use up some of their irreplaceable 5–year lifetime limit. This is precisely the type of relief that cannot be remedied at the end of this litigation. For example, it is not inconceivable that this lawsuit might not be resolved within the next two years. Thus, even if the plaintiffs were ultimately successful, those who would be forced to go on welfare in the interim would have lost about 40 percent of the total time in their lives that they are allowed to be on welfare. Neither the defendants nor the court could provide a remedy for these damages. Thus, this irreplaceable loss would constitute irreparable harm.

Because the court concludes that the plaintiffs have already demonstrated that they will suffer irreparable harm if the court does not issue an injunction, the court need not address the plaintiffs' additional arguments for why they have shown irreparable harm.

### a. Plaintiff Tina Smith Has Not Demonstrated Irreparable Harm

 As to plaintiff Tina Smith, however, the court cannot agree that she has suffered an irreparable injury because of her suspension from the Coalition. Looking to the record, the court finds the three declarations from the American Café employees as to what really happened between Tina Smith and Maria Trejos on June 21, 2001 to be rather compelling. All three people—employees Gloria Waul and Maria Trejos, and owner Ahmed Mohammed—have absolutely nothing to do with the lawsuit. Accordingly, at this point in the litigation, the court accords the defendants' version of the altercation more weight. Based on Ms. Smith's apparent verbal assault of Ms. Trejos and her threat of physical violence, the Coalition acted well within its discretion in deciding to suspend her pending an investigation.

The case law is well-settled that "[a] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Fiba Leasing Co., Inc. v. Airdyne Indus., Inc.*, 826 F.Supp. 38, 39 (D.Mass.1993); *see also San Francisco Real Estate Investors v. Real Estate Investment Trust*, 692 F.2d 814, 818 (1st Cir.1982); *Barton*, 131 F.Supp.2d at 247. In this case, the court determines that Ms. Smith's conduct makes the harm self-inflicted. Accordingly, Ms. Smith has not met her burden to show that she deserves injunctive relief, and the court will deny the motion as to this plaintiff.

### 3. The Balance of the Equities

 Like the previous two factors, the balance-of-harms prong strongly militates

in favor of granting injunctive relief. The plaintiffs argue convincingly that the requested relief will in no way "impinge upon the Coalition financially." *See* Reply at 15. For example, they note, that 40 additional hours of work per week at $7.50 per hour equals $300 per week. This hardly seems like a crippling burden to place on the Coalition pending the outcome of the litigation.

The defendants counter that granting the injunction: (1) would harm the Coalition financially by forcing it to allow the plaintiffs to work additional hours, resulting in additional payments to the plaintiffs even though those additional hours will not benefit the Coalition; (2) would "paralyze" the Coalition from taking appropriate action to manage its employees; and (3) would damage the Coalition's discretion in operating its organization. Whereas the potential harm to third parties and to the Coalition of plaintiffs' requested relief is minimal at best, the harm to the plaintiffs by denying them injunctive relief would be severe.

### 4. Granting the Injunction Serves the Public Interest

 Lastly, the court agrees with the plaintiffs that by issuing an injunction, the court would serve the public interest in ensuring that employers do not take retaliatory action when employees file complaints of discriminatory treatment. The court acknowledges the validity of the defendants' argument that the public interest is also served by allowing organizations to have discretion to manage their internal operations as they see fit and by ensuring the efficient use of resources. In this case, however, the plaintiffs' articulation of the public-interest rationale outweighs the defendants' position.

In short, then, the court holds that the plaintiffs have made a compelling showing on all four factors of the preliminary-injunction test.

### C. The Defendants' Unclean Hands Argument

 In addition to opposing the issuance of an injunction on the ground that the plaintiffs do not pass the four-factor test, the defendants also raise another argument: namely that the motion should be denied "because plaintiffs come before this Court with unclean hands." *See* Defs.' Opp'n at 34. The Supreme Court has held that a party asserting an unclean-hands defense must show an "immediate and necessary relation" between the instant case and the alleged misconduct. *See Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933). The defendants fail to meet this burden.

The defendants ground their argument on the fact that Elizabeth Lee hired employees with personal ties for the sole purpose of enabling them to become plaintiffs in this lawsuit, thus attempting to artificially inflate their alleged damages. The best reading of the record in the declarations indicates no such fact. The defendants' assertion that Elizabeth Lee, a $12–an–hour employee who was hired only five months earlier, was solely responsible for hiring decisions in the remittance and data entry department does not pass the smell test. The plaintiffs' declarations are more convincing when they claim that Tracy Ammons, the Director of Human Resources, and, ultimately, Roberta Combs, the Coalition's Executive Director, made these personnel decisions.

The defendants also assert that Candace Wheeler, a former employee and a white woman, has a political and financial agenda tied to this litigation. They accuse her of stealing confidential Coalition documents. *See* Surreply at 14 n. 17. The plaintiffs respond by stating that the "[d]efendants

seem incapable of imagining that a white, Christian employee could be legitimately concerned about, and even deeply offended by, the Coalition's segregation of African-American employees." *See* Reply at 8. Nothing in the record supports the defendants' position as to Ms. Wheeler.

Finally, the defendants offer exhibit 5 as an example of the plaintiffs' allegedly impure motives. The exhibit is a one-page, handwritten memo that was allegedly found in the remittance and data processing room. It contains four bullet points, the first reading "Tell other plaintiffs that going for counseling is a must for a larger settlement." *See* Defs.' Opp'n, Ex. 5. The top of the memo lists plaintiff Cynthia Moore's name. *See id.* In response, the plaintiffs state that "Ms. Moore would not write herself a note in this fashion and did not do so. Nor did Plaintiffs' counsel. Defendants do not authenticate who authored this document, for what purpose, or who received it." *See* Reply at 18 n. 11. The court agrees with the plaintiffs that this exhibit is totally unauthenticated, and without more evidence, the court will not consider it. In short, the defendants have failed to meet their burden of showing that the plaintiffs have unclean hands.

### D. Remedy

Accordingly, the court grants in part and denies in part the plaintiffs' motion for a preliminary injunction. Specifically, the court denies the plaintiffs' motion as to plaintiff Tina Smith, and will not order the Coalition to reinstate her. The court does, however, rule for the other plaintiffs. In doing so, the court will follow relevant case law and seek to fashion a narrow remedy. The court orders the defendants not to engage in any acts of unlawful retaliation against the plaintiffs. Moreover, the court orders the defendants to restore the other three hourly employees—plaintiffs Lisa Sutton, Marion Wilson, and Lanae McCol-

lum—to the standard work hours of 9 a.m. to 4:30 p.m. with a guaranteed minimum pay for four hours work per weekday (excluding legal office holidays) for the duration of this lawsuit.

### IV. CONCLUSION

For all these reasons, the court grants in part and denies in part the plaintiffs' motion for a preliminary injunction. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately issued this 27th day of July, 2001.

### *ORDER*

### GRANTING IN PART AND DENYING IN PART THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

For the reasons stated in the court's Memorandum Opinion issued separately and contemporaneously this 27th day of July, 2001, it is

**ORDERED** that the plaintiffs' motion for a preliminary injunction is **GRANTED in part** and **DENIED in part**; and it is

**FURTHER ORDERED** that the plaintiffs' motion is **DENIED** as to plaintiff Tina Smith and the court will not order the Coalition to reinstate her; and it is

**ORDERED** that the defendants shall not engage in any acts of unlawful retaliation against the plaintiffs; and it is

**FURTHER ORDERED** that the defendants shall restore the remaining hourly employees—plaintiffs Lisa Sutton, Marion Wilson, and Lanae McCollum—to the standard work hours of 9 a.m. to 4:30 p.m. with a guaranteed minimum pay for four hours work per weekday (excluding legal office holidays) for the duration of this lawsuit.

**SO ORDERED.**